STATE of Missouri,
Plaintiff-Respondent,

v.

Jack Lee NOBLE, Defendant-Appellant.

No. 10806.

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 28, 1979.

Motion for Rehearing and Application to Transfer Denied Dec. 18, 1979.

Application to Transfer Denied
Jan. 15, 1980.

John Ashcroft, Atty. Gen., Richard F. Engel, Mary C. P. Pincus, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

David Robards, Joplin, for defendant-appellant.

MAUS, Judge.

The defendant was charged with armed robbery. The jury returned a verdict of guilty, but was unable to agree upon the punishment. The trial court imposed a sentence of 50 years imprisonment.

One of the appellant's points upon appeal is the insufficiency of the evidence to support the verdict. This requires a summary of the evidence. Near the closing time of 11:00 p. m. of a convenience store, the husband of the operator arrived to take his wife home. While standing in the front of

the store, he felt something in his back. He turned around and there stood a white male, wearing a ski mask, with a blue steel revolver. At the command of the assailant, the operator placed the store's money in the money bag, the husband gave the assailant his billfold and the husband and wife lay down on the floor. The assailant left. As he was leaving he was seen by an approaching customer who then went into the store.

Neither the operator, her husband nor the customer were able to identify the defendant as the robber. They did give a general physical description and a description of the clothing worn, including a jean jacket with an observable white spot on the arm and off-white rubber gloves.

Within approximately two minutes after the robber entered the store, the police received a report of the crime. At 10:42 an alert was broadcast over the police frequency. Officer Nail was in the vicinity and was at the store within a minute after the broadcast. He obtained a description of the automobile and from the store put that description on the police frequency. Within another minute Officer Nail heard a transmission of a police unit pursuing an automobile as the result of his alert.

Officer Wixon, who was in the vicinity in an unmarked police car, heard the alert and Nail's description of the fleeing automobile. At about that time Officer Wixon met and passed an automobile. As they passed, he observed the passenger in the front seat duck. Officer Wixon then turned around and started to follow the automobile which then speeded up. Officer Wixon followed and at 10:48 reported that he was in pursuit. After approximately three blocks, Officer Wixon turned on his red "Kojack light" and siren. He had affixed the Kojack light to the dash. Later Officer Wixon was joined by another unmarked police car with siren and Kojack light and two "black and white" police cars with conventional red lights and sirens.

The pursuit was along a circuitous route on the streets and alleys of Joplin reaching speeds of 80 m. p. h. During the chase when he was approximately 10 or 15 feet from the fleeing automobile, Wixon saw the passenger turn in the seat and point a gun at him through the back glass. At this point Wixon abandoned his effort to stop the automobile by crowding it to the side. Also during the chase at one point Wixon saw something thrown from the passenger side of the automobile. Later in the chase he saw the passenger open his door and throw from the car what appeared to be a "ski mask or hat of some sort".

The chase came to an end when the fleeing vehicle attempted to make a turn at an intersection and was hit by one of the pursuing police cars. The fleeing automobile was driven by Linda Trease with whom the defendant had been living for approximately six months. The defendant was a passenger in the front seat. His jean jacket (which had a white spot on the sleeve and was unequivocally identified by the operator) and white plastic gloves were in the front seat. The money bag, the husband's billfold, a ski mask and a blue steel .38 revolver were found at diverse points along the route of the chase. Phillip R. Whittle, Ph.D., Director of the Regional Crime Laboratory, whose qualifications were admitted, examined hairs from the ski mask as compared to hairs from the head of the defendant. He testified that the results of his examination were consistent with the hairs having come from a common source. He did admit there was a "slight possibility" that hairs of another person could be exactly the same consistency as those of the defendant.

The defendant testified. It was developed that he had spent 27 years in the Missouri Penitentiary. He had been sentenced for a previous armed robbery and participation in a prison riot which resulted in murder. He stated that since his release from prison in March, 1975, he worked on construction. Concerning the evening in question, he stated that he and Linda had been at a house owned by her parents for the purpose of giving her father suggestions on how to improve it. He and Linda were returning home when they observed they were being followed by a car that

"acted like it was trying to push us off the road at one point". He was afraid this action resulted from enemies he had made in the penitentiary and he instructed Linda to keep going. Although they were in a chase, he said they first saw the red light and first heard the siren many blocks after the point at which the officer said he turned them on. He accounted for the subsequent failure to stop and efforts to elude four police cars in the multi-block chase at speeds up to 80 m. p. h. by the fact that Linda Trease did not have a driver's license. He vigorously denied the robbery, pointing a gun at the pursuing officer and throwing anything from the fleeing automobile. He did say that the little boy (apparently the son of Linda) had a ski mask at least similar to the one recovered and that when he opened his door during the chase to see if a tire had blown out, the mask could have fallen from the car. He said he used the plastic gloves on the job and his jean jacket was used in climbing towers "where it got the paint and stuff on it, it's all over it".

■ In urging the insufficiency of the evidence he emphasizes alleged inconsistencies such as: the victim and her husband at one time said the ski mask had eye holes instead of a slot; the descriptions of the robber as compared to the defendant; and the customer's description of the car as a dark Fairlane Ford when it was also described as a light tan, faded color, tan or brown. In considering this testimony the jury could conclude the ski mask was only briefly observed while under great stress; that the descriptions of the robber as taller than or about the same height as the victim's husband (who was 5′ 10½″) and weighing 145–150 pounds were compatible with his own statement he was a little over 6 feet and under his normal weight of 187 pounds; that under the light at the store the Fairlane Ford could have appeared to the customer to be darker than it was. These alleged inconsistencies were not destructive of the state's case and were for the jury to resolve, which they did against the defendant. *State v. Smart*, 328 S.W.2d 569 (Mo.1959).

■ On the other hand, to find the evidence insufficient the jury and this court would have to accept as coincidences such facts as the following: the robber was of the same general description as the defendant; he fled in a Fairlane Ford of the same general vintage as the Fairlane Ford in which the defendant was riding; that the robber wore off-white plastic gloves and a jacket with white spots virtually identical to those of the defendant; that Linda's little boy happened to have a ski mask similar to the one worn by the robber, which mask happened to be in the car in October and which happened to fall from the car; and that the robber drove at least a portion of the circuitous route of defendant's flight and although not pursued, discarded a moneybag containing in excess of $360 and a billfold containing in excess of $50. On top of that to be accepted would be the proposition that Linda and the defendant attempted to flee from four police cars because Linda did not have a driver's license. It is not necessary to have eyewitness identification. The sufficiency of the evidence to establish guilt is overwhelming. *State v. Hatten*, 561 S.W.2d 706 (Mo.App. 1978).

Defendant's next point is that the trial court erred in giving the jury a part of MAI–CR 4.50 (the Kerry Brown instruction). The instruction complained of was given under the following circumstances. The case was submitted to the jury at 5:16 p. m. At 6:30 p. m. the jury returned to the courtroom and the foreman in response to inquiries from the court said the jury had reached a verdict; "Well, I can give the verdict, yes. . . . No, we haven't completed it yet. . . . I feel that a few more minutes we can, yes." The court then stated: "I see some difference of opinion on a couple of the jurors." The net effect of the questions and answers and observations of the court can best be summarized by the minutes of the trial judge: "Court calls jury back at 6:30 p. m. Jury indicates that they have not agreed upon the sentence."

The court then gave the jury an additional instruction being that part of MAI–CR 4.50 that reads as follows:

"The court will now read to you an additional instruction which will be hand-

ed to you with an additional form of verdict.

If you unanimously find the defendant guilty you should fix the punishment. If however, after due deliberation, you find the defendant guilty, but are unable to agree upon his punishment, you will complete the verdict form so stating, and in that event the court will fix the punishment."

The court then said: "I will give you that instruction together with the form of verdict that goes with it. If you will retire to your jury room and *deliberate some more,* ladies and gentlemen." (Emphasis added).

■ The defendant first complains that the trial court should not have given this instruction because the foreman of the jury said: "I feel that a few more minutes we can, yes." The defendant deals with the observation of the trial court that he observed some differences of opinion on a couple of the jurors by saying the foreman knew the likelihood that a verdict would be reached far better than the trial court. This is not acceptable. There can be no comparison of the ability of the foreman to that of the trial judge to gauge the atmosphere of the courtroom. The foreman's misconception was demonstrated by the immediate response of at least two of the jurors. When MAI–CR 4.50 is to be given depends not only upon time but upon the circumstances.[1] The circumstances of this case are remarkably similar to *State v. Morris,* 476 S.W.2d 485 (Mo.1971). That instruction has been approved after one hour and forty-five minutes deliberation, *State v. Macon,* 547 S.W.2d 507 (Mo.App.1977) and two hours, *State v. Hubbs,* 294 Mo. 224, 242 S.W. 675 (1922).[2] There was no abuse of discretion. *State v. McAllister,* 468 S.W.2d 27 (Mo.1971); *State v. Macon,* supra.

■ The defendant next argues that the judgment must be reversed because the instruction did not include the last paragraph of MAI–CR 4.50. The omission of that paragraph in this case is not reversible error for two reasons. First, assuming it was error and that it had been properly preserved, its prejudicial effect is "to be judicially determined." V.A.M.R. Crim. Rule 20.02(e). This case is not comparable to *State v. McCracken,* 518 S.W.2d 229 (Mo. App.1974), cited by the defendant, in which the court in initially submitting the case to the jury gave, without any further instructions concerning the assessment of the punishment, an alternative form of verdict by which the jury could find the defendant guilty but report they were unable to agree upon punishment. Here the case was initially submitted to the jury with no suggestion that they could reach a verdict without assessing the punishment. The instruction given did contain an admonition that the jury "should fix his punishment." While oral communications to the jury are to be undertaken with caution, the trial judge added the jury should retire "and deliberate some more". In no way was there coercion. The instruction given contains a stronger charge that the jury should fix the punishment than that contained in the pre MAI–CR "Kerry Brown" instruction which has been approved time and again. *State v. Brown,* 443 S.W.2d 805 (Mo. banc 1969); *State v. Bolden,* 494 S.W.2d 61 (Mo.1973); *State v. Thompson,* 465 S.W.2d 590 (Mo. 1971). Such approval is tantamount to a determination the instruction as given was not necessarily prejudicial. The circumstances under which it was given further establish there was no prejudice. The jury had reported it had reached a verdict of guilty but could not agree upon punishment. Under these circumstances, the action of the trial court in immediately accepting the verdict has been approved. *State v. Macon,* supra. No prejudice result-

---

1. Under the Notes on Use pertaining to MAI–CR 4.50 in MAI–CR (First Addition) that instruction could be given at the time of or after submission. Under these Notes on Use and How to Use This Book in MAI–CR (Second Addition) that instruction may be given, except in capital murder, " 'if after due deliberation by the jury the court finds the jury cannot agree on punishment.' Section 557.036.2, RSMo."

2. The use of the "hammer" instruction has been approved after 2 hours and 3 minutes, including a lunch break. *State v. Taylor,* 508 S.W.2d 506 (Mo.App.1974).

ed in giving them an opportunity to deliberate some more under the instruction that was given. Second, the defendant did not preserve this point in his motion for a new trial. It may be properly considered as a basis for reversal only if the instruction was plain error affecting substantial rights when manifest injustice or miscarriage of justice has resulted therefrom. V.A.M.R. Crim. Rule 27.20. It did not. *State v. Jones,* 564 S.W.2d 930 (Mo.App.1978). Also, paraphrasing a recent case: "Even if the plain error rule is applicable, to warrant relief under that rule the court must find that a manifest injustice has occurred. In the present case, however, the [fifty] year sentence received by appellant was within the statutory limits . . . . Either the judge or the jury could assess such punishment. Appellant, therefore, cannot demonstrate prejudice resulting from the fact that the [judge] assessed punishment." [changed from ten and jury] *State v. Campbell,* 543 S.W.2d 518, 520 (Mo.App.1976). Also see *State v. Morris,* supra.

■ The defendant next alleges the trial court erred in not declaring a mistrial following a statement by the customer who was a witness. On direct examination the customer identified the automobile leaving the store as a Fairlane Ford. On cross-examination he was asked if at the preliminary hearing he did not say he couldn't tell whether it was a Ford or Chevrolet. He responded, he couldn't remember; possibly, he didn't know. When defense counsel then asked if the description of the car was "arrived at by your talking to the officer", the customer asked to speak to the prosecutor and the attorney. Upon the court admonishing him to answer the questions and the customer saying that if the matter was pursued it would damage everything, the customer said: "The reason I don't [sic] come forth with the direct statement before is because I have been getting telephone calls threatening my life." Upon the basis the answer was not responsive, defense counsel moved for a mistrial which was refused. He then moved that the answer be stricken which was refused. Then, out of the hearing of the jury, the prosecutor advised the court he had no objection to the

answer being stricken. Thereupon, the court instructed the jury to disregard the statement and asked defense counsel if that was all right. Defense counsel replied, "Thank you, Your Honor."

For the purpose of this point, it is assumed but not decided that it was not responsive for the witness to so explain his apparently inconsistent testimony. But, this does not mean the court was compelled to declare a mistrial. The trial court could have considered the question and response to have been an abandonment of the request for a mistrial. Also, the declaration of a mistrial is largely in the discretion of the court. This was an isolated remark in a lengthy trial. In view of the strong evidence of guilt it cannot be said the jury was prejudiced and did not follow the court's direction in reaching its verdict of guilty. There was no clear abuse of discretion. *State v. Carlos,* 549 S.W.2d 330 (Mo. banc 1977).

■ The defendant next alleges the trial court erred by admitting in evidence the revolver found on the path of flight because it was not directly identified as the weapon the robber held. As Officer Wixon pursued the fleeing car the defendant pointed a gun at him. Thereafter something was thrown from the automobile. The revolver was found in that vicinity. Under the circumstances, this was sufficient identification. *State v. Johnson,* 286 S.W.2d 787 (Mo.1956).

■ The last allegation is that the trial court erred in not granting a new trial because of newly discovered evidence. The newly discovered evidence was a confession of Mahan, who was confined in the Jasper County jail at the time the defendant was so confined. Mahan was called as a witness but upon claiming the protection of the Fifth Amendment refused to testify. His claim to this crime was established by the testimony of the defendant's trial counsel and a deputy sheriff. His confession to counsel took place in the jail after the defendant told his counsel that a man in the jail admitted he had committed the robbery. Mahan related to counsel the event of the robbery and that after leaving he saw a police car chasing another car. Mahan then

dodged through several streets and alleys, discarding the money obtained through the robbery. He disposed of his stocking cap later and sold the revolver at a bar in Kansas City.

Assuming all of the other requirements are met, a new trial on the basis of newly discovered evidence should be granted only when that evidence is credible enough that it would probably produce a different result. *State v. Lindley,* 545 S.W.2d 669 (Mo. App.1976); *State v. Nelson,* 532 S.W.2d 806 (Mo.App.1975). The facts related by Mahan could easily have been supplied by the defendant. The strength of the state's evidence at the trial is an important consideration. The trial court had an adequate basis to determine the newly discovered evidence that Mahan after obtaining approximately $410 by robbery, upon seeing the police chase someone else, discarded the money, but kept his stocking cap and gun, did not rise to the required level of credibility. *State v. Woods,* 577 S.W.2d 122 (Mo.App. 1979).

The judgment is affirmed.

All concur.